## STATE v. PRINCE.

No. 4905.   Decided January 4, 1930.   (284 P. 108.)

206

*F. E. Woods,* of Price, for appellant.

*George P. Parker,* Atty. Gen., and *Lawrence A. Miner,* Asst. Atty. Gen., for the State.

FOLLAND, J.

Defendant was convicted of extortion. It was charged by the information that the defendant "willfully," etc., "did extort and obtain from John Eaquinta," with the consent of Eaquinta, $100, the consent being induced by force and fear, through threats to take his life, and Eaquinta, "then and there being induced solely by reason of said force and fear, did then and there consent" and pay to Prince the sum of $100. Section 8320 of our statute provides:

"Extortion is the obtaining of property from another with his consent, induced by a wrongful use of force or fear, or under color of official right." Section 8321, so far as applicable here, reads: "Fear, such as will constitute extortion, may be induced by a threat, either: 1. To do an unlawful injury to the person * * * of the individual threatened, * * *"

At the trial defendant requested the court to instruct the jury to return a verdict of "not guilty of extortion." The refusal of the court to give this instruction was assigned as error. It is not disputed that the evidence sufficiently proved every element constituting the crime of extortion, except that in paying the money Eaquinta was actuated by fear. Defendant contends that the evidence conclusively shows Eaquinta in paying the money, was not actuated by either force or fear, but by another and different motive, that of entrapping the defendant at the suggestion of the county attorney. The state urges there is sufficient

competent evidence from which the jury might properly conclude that fear was the actuating or controlling motive prompting payment of the money. It is not necessary to show that fear was the sole motive but only that it was the primary or controlling cause.

Our statute on extortion is in the same language as that of California. In construing the statute there the Supreme Court of California said:

"The statute can only mean that the unlawful use of force or fear must be the operating or controlling cause which produces the consent. If some other cause were the primary and controlling one in inducing the consent, then there would be no extortion." *People* v. *Williams*, 127 Cal. 212, 59 P. 581, 582.

The court, in its instructions, at the request of defendant, adequately and clearly presented to the jury the issue as to whether or not fear was the controlling factor in inducing Eaquinta to consent to and to pay the money to defendant. The jury was further instructed that, if they should find some other cause was the controlling one inducing the consent to the payment of the money, or if they had a reasonable doubt about it, they could not find defendant guilty of extortion. The jury, upon these instructions, returned a verdict of guilty of extortion. If there is sufficient competent evidence in the record to the effect that fear was, at the time of payment of the money, the controlling or primary cause for its payment, then the court properly refused to give the peremptory instruction requested by defendant.

The complaining witness, Eaquinta, is an illiterate Italian residing at Helper, engaged in the business of peddling goats' milk, cheese, and goats, and in producing the same. He is the father of 10 children and is industrious and frugal. As he does not use the English language well, his testimony was taken through an interpreter. All of the facts with respect to threats by the defendant rest upon the testimony of Eaquinta, since the defendant did not take the stand. The conversations between them, except the first, were had with-

out others being present. According to Eaquinta, on about
May 29, 1928, he went to a boarding house conducted by a
Mrs. Stella in Helper for the purpose of delivering some
cheese and young kids. Here he met the defendant Prince
and two strangers. By them he was invited into the base-
ment of the house, where he was told that on account of
some trouble he had previously had with one Phillip Bolinda,
that Bolinda had spent some $5,000 to kill Eaquinta, and
that Eaquinta was supposed to make good for it. The two
strangers told Eaquinta they had come to kill him; that he
was lucky he had his big family; that because of this good
family they would not do it, but would leave him to Prince,
the defendant. All four of the men then went up stairs and
drank a bottle of wine, for which Eaquinta paid. A day or
two later Prince told Eaquinta these two strangers had left
an order for Prince to collect $500 from him. Eaquinta put
his hands to his face and said, "How can I furnish $500;
they even work without shoes and overalls; boys and girls
working in my family." Prince said, "I am sorry, but I
can't help it; you will have to furnish the money if you want
to live." Eaquinta then stated he must have patience until
pay day; that maybe he could collect some money and pay
him.

A few days later Prince saw Eaquinta again, and asked
him if he had the money, and, upon being told he had not
collected any yet, Prince said, "You got to get this money;
I don't want to know anything whether you collect it or not."
The amount demanded was reduced to $175 and the two men
parted with the understanding that Eaquinta would go to
the bank the next day and get the money. When the witness
was asked what effect these threats had upon him, he
answered through the interpreter, "He says he got so damn
scared he went to Gianotti, to the doctor, to Dr. Gianotti."
After the last conversation Eaquinta went home, but could
not sleep all night, he was so worried. He says he figured
he would go to Prince and see the court, meaning the county
attorney. The next morning he visited the county attorney,

carrying $200 in his pocket, and there told his story. The county attorney called in the sheriff. The officers took the numbers of five $20 bills belonging to Eaquinta, handed them back to him, and told him that $100 was enough to give the defendant; that, "if he wanted the money, to give it to him." The sheriff arranged to follow Eaquinta to Helper for the purpose of apprehending Prince after the money had been paid him, and Eaquinta was told that he would get his money back. Whereupon the same morning Eaquinta drove to Helper on his truck, with his son as chauffeur, and was followed by the sheriff and two deputies. Eaquinta called at several houses in the usual way, attending to his business, and, when he reached the boarding house of Stella, Prince was in the yard. Prince followed Eaquinta into the house, called him into the front room alone, and asked him if he had brought the money. Eaquinta said, "Yes," and handed him $100, which he counted and put in his pocket, after which Prince invited Eaquinta and his son to drink. Eaquinta said he did not care for wine, because "my head is so big, but I would like to have a glass of beer." After drinking together, Eaquinta left the house and indicated to the officers that Prince was there. Prince then came out of the house and was arrested by the officers, while Eaquinta hurried away. Upon being searched, Prince had in his hand the marked bills given him by Eaquinta, as well as some other money and a pocketknife. Defendant's attorney cross-examined Eaquinta at considerable length in an endeavor to develop the idea that he was actuated chiefly or solely in paying the $100 to Prince by instruction of the officers, and that no longer had any fear, because the sheriff would follow him to Helper and arrest the defendant.

We shall cite some of the evidence showing that Eaquinta was actuated by fear, which continued as a controlling factor in the payment of the money, notwithstanding his conversation with the officers and their activity in his behalf. It is quite apparent that nothing was done by the officers or by Eaquinta to entice or encourage the commission of

this crime. Prince was at all times the moving party. No trap was set for him, except the one of his own making. That Eaquinta was actuated by fear is shown by the fact that he lost sleep at nights. He complained to the sheriff. He drew his money from a place of safety and carried it with him in order to make payment. Even after he had been assured of protection by the officers, and knew they were following him, he did not go directly to seek Prince, but went in his usual way, attending to his business, and then paid the money only after Prince had again demanded it, and, after this was done, with the sheriff and his deputies close at hand, he hurriedly left the house in fear and trembling. It will be remembered that Eaquinta is a foreigner and illiterate. The threat to kill was actual and real to his mind. He, at no time, said that he had abandoned all idea of giving the money to Prince. He did, however, say that in his mind he had decided not to pay the money until he had seen the "court." The officers, in giving their instructions to him, merely told him to pay the money if Prince wanted it.

On cross-examination Eaquinta was asked if, on the morning the money was paid, he had not been trying to find Prince. This he repeatedly denied.

"Q. Then John I ask you again if you weren't trying to find him, meaning Rosa? A. Never he says.

"Q. But you did find him? A. He says sure he find him in that house.

"Q. At Stella's place? A. Yes sir.

"Q. And you stated that you paid him this marked money? A. He says he asked for it."

The district attorney inquired:

"Q. Were you still afraid when you went up to Stella's house on that day? A. Sure he says yes."

And when he came out of the house, it is shown by the testimony of the officers that he appeared to be frightened and was trembling. On cross-examination the sheriff was asked:

"Q. After you told him that you would protect him did he still have that frightened appearance or did that calm him a little? A. It seemed to give him some satisfaction if we would go with him.

"Q. He appeared to be somewhat satisfied? A. He did to some extent."

From the whole record we are unable to say that the evidence conclusively shows that the fear which Eaquinta admittedly suffered before he visited the sheriff had been so overcome and dissipated that when the money was paid he was no longer actuated or controlled primarily by fear induced by threats. On the other hand, we think the jury could well have found, as they did, that fear induced by threats was the controlling factor. Eaquinta said he was afraid when he went to Stella's house, and the facts and circumstances surrounding the transaction bear out his statement that he was still in fear. The defendant had done all that he could toward the accomplishment of the crime of extortion. His unlawful intent was manifest. The threats to kill had been made, not once, but several times. He demanded the money on the day it was paid, and when paid accepted it and put it in his pocket. So far as defendant knew, the extortion was complete. His wicked purpose was accomplished. There was sufficient evidence to show that fear induced by threats was the controlling factor in the payment of the money.

The crime of extortion is analogous to robbery, where also the element of force or fear is an essential to the commission of the crime. With respect to the presence of this element in the perpetration of robbery, it is said in 1 Bishop on Criminal Law (9th Ed.) § 439, p. 317:

"But if there is an assault which would furnish a reasonable ground for fear, the robbery is complete though the person assaulted relinquishes his money for the purpose of bringing the wrong-doer to punishment."

A similar question arises in connection with the crime of obtaining money under false pretenses, where an essential

element is that the false representations be believed and acted upon. With respect to this element it is said in Underhill on Criminal Evidence (2d Ed.) § 442, p. 736:

"The prosecuting witness may testify that he believed in the false pretenses. The evidence must show beyond a reasonable doubt that he believed that the representations were true and that, relying and acting upon them, he parted with his property upon faith in them. But they need not be proved to have been the sole exclusive and decisive cause thereof. He may have been influenced by considerations of friendship, or the desire of gain, and whether he was so influenced, and by what and to what extent, are questions for the jury."

Assignments of error numbered 2, 3, and 4 raise the question whether the court properly instructed the jury as to an attempt to commit the crime of extortion as an included offense. All the authorities describe an attempt to commit a crime as consisting of three elements: (a) The intent to commit the crime; (b) the performance of some act toward the commission of the crime; and (c) failure to consummate its commission. 16 C. J. 113. The failure to consummate the crime is an essential element where the charge is an attempt to commit a named crime.

Section 8326 is as follows:

"Every person who unsuccessfully attempts, by means of any verbal threat, such as is specified in section 8321, to extort money or other property from another is guilty of a misdemeanor."

This section is in the chapter entitled "Extortion." Section 8527 defining attempts is as follows:

"Any act done with intent to commit a crime, and tending but failing to effect its commission, is an attempt to commit a crime. Any person may be convicted of an attempt to commit a crime, although it appears on the trial that the crime intended or attempted was perpetrated by such person in pursuance of such attempt, unless the court, in its discretion, discharges the jury and directs such person to be tried for such crime."

Section 8528 so far as appropriate here is:

"Every person who attempts to commit any crime, but fails, or is prevented or intercepted in the perpetration thereof, is punishable, where no provision is made by law for the punishment of such attempt, as follows:

"1. * * *

"2. If the offense so attempted is punishable by imprisonment in the state prison for any term less than five years, the person guilty of such attempt is punishable by imprisonment in the county jail for not more than one year."

Section 9025 reads:

"The jury may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged in the indictment, or of an attempt to commit the offense."

Under the last quoted section it was clearly proper for the court to instruct the jury with respect to an attempt to commit extortion and for the jury to have returned a verdict of guilty of an attempt if they should have found that any of the elements of the completed crime were not proven beyond a reasonable doubt, or if there existed a reasonable doubt as to any of them, and should also find that the necessary elements of attempt were satisfactorily proven. The instruction defining attempt is as follows:

"You are instructed, gentlemen of the jury, that embraced within information in this case is the charge of an attempt to commit the crime of extortion. An attempt to commit a crime is defined by the law of this state as any act done with the intent to commit the crime, and tending but failing to effect its commission. It you believe therefore from the evidence beyond a reasonable doubt that the defendant intended to commit the crime of extortion as charged in the information and coupled with that intent did some act or acts charged in the information but failed to effect the commission of the completed crime through the intervention of some agency not set in motion by the defendant himself then you should find the defendant guilty of an attempt to commit the crime of extortion."

This is a proper instruction and states the law so far as it goes. The court might appropriately have instructed the

jury that a "verbal threat" is equivalent to "any act done," and thus applied the law more specifically to the facts of the case. Since no such instruction was requested by the defendant, and the instruction as given was at least as favorable to the defendant as an amplified one could possibly be, we see no prejudice to any substantial right of the defendant. It is contended the court instructed under section 8527, defining attempts generally whereas the instructions should have been predicated upon section 8326, which refers to attempts to commit extortion specifically.

Instruction No. 5 reads:

"You are instructed 'that every person who attempts to commit any crime which is punishable by imprisonment in the state prison for a term of less than five (5) years, but fails or is prevented or intercepted in the perpetration thereof is punishable by imprisonment in the county jail for not more than one (1) year."

The court in instruction No. 4 told the jury that the punishment for extortion as defined is imprisonment in the state prison for a term of not exceeding three years.

The assessment of punishment is for the court, not for the jury. While it was unnecessary for the court to instruct the jury as to the amount of punishment for either extortion or an attempt, it was not error so to do. 16 C. J. 1026. It is elementary that, where two statutes treat the same subject-matter, the one general, the other special in its provisions, the special provisions control. *Salt Lake City* v. *Salt Lake County*, 60 Utah 423, 209 P. 207. Had section 8326 not been enacted, then the general provisions in sections 8527 and 8528 would apply in case of an attempt to commit extortion. We see no conflict in these two sections, except in section 8326 the penalty provided is different to that provided in section 8528. Under either the attempt is a misdemeanor. Under section 8528 the penalty is one year in the county jail, and is applicable "where no provision is made by law for the punishment of such attempt."

Section 8326 provides an unsuccessful verbal threat is a misdemeanor, which is punishable by six months in the county jail, or a fine of $300, or both. The effect of section 8326 is to make clear that a mere verbal threat is sufficient to meet the requirement that an act, coupled with intent, amounts to an attempt. With the exception of the penalty provided, the several sections may be read together, and their provisions adopted and applied without conflict. It follows that the penalty provided in the section having special reference to an attempt to commit extortion is the one applicable. The court erred in stating as he did that this attempt was punishable by imprisonment for one year in the county jail. However, we think this error is entirely without prejudice to any substantial right of the defendant. It was less harmful to the defendant for the jury to have been mistakenly informed that the included offense of attempt carried a higher penalty than in fact could be imposed by the court. In any event, he cannot complain, because the jury found that all the elements of the completed offense had been proven, and the court was not called upon to pass sentence for an attempt.

At the time of the arrest of defendant he was searched by the officers who took from him the $100 in bills which had been paid to him by Eaquinta, some other moneys, and a pocketknife. The officer gave this evidence without objection. The pocketknife was offered and received in evidence over objection by defendant. The admission of the knife as an exhibit is urged as error. No case or other authority has been cited by the defendant in support of his contention. The defendant was accused of making threats to kill. The knife was found in his possession. We see no error in introducing this knife in evidence.

The sheriff, while on the witness stand, was asked the following question by the district attorney: "Q. State whether or not he [Eaquinta] complained to you concerning threats that had been made against his life? A. Yes." Objection was made to the question and the court directed the answer be

limited to "yes" or "no." Defendant concedes that
the state was entitled to ask whether complaint had
been made to the witness by Eaquinta, but contends
that the question went too far, in that it particularized as to
threats against his life.  We see no prejudice to the defen-
dant by this answer.  The detailed information with respect
to the substance of the complaints made by Eaquinta to the
county attorney and the sheriff were already before the
jury.  This information had been elicited by the defendant's
counsel on cross-examination, when Eaquinta said that he
had told the officers of the statements of Prince including
the threats, in substantially the same language as he had
repeated them upon the witness stand.

We cannot hold that it was error for the court to allow
this answer.  To constitute extortion, the wrongful use of
fear must be the operating cause which produces the con-
sent.  The state of mind of Eaquinta as to whether or not
he was in fear induced by threats, became a material and
relevant fact to be proved by the state; that he was in fear
may be shown, not only by his conduct in seeking the ad-
vice of the county attorney and sheriff, but also by his decla-
rations to them.  "A person's mental state of fear is provable
by his declarations, unless they are too remote."  22 C. J.
281, "Evidence."  "Where the emotions, feelings, or state
of mind of a third person are to be proved, the courts often
admit declarations of such third persons as original evi-
dence."  3 Jones, Commentaries on Evidence (2d Ed.) §
1219.

Thus in *People* v. *Beggs,* 178 Cal. 79, 172 P. 152, where
the question was as to the admissibility of conversations
had by the complaining witness to his father and others, out-
side the presence of the defendant, including the statement
that they were taking his money, it was held that, while
parts of the testimony were immaterial, yet "in so far as the
evidence admitted was prejudicial to the substantial rights
of the defendant, it was competent and proper as part of
the res gestae in establishing that at the time and immedi-

ately following the making of the threats he was laboring under fear induced by such threats."

In the case of *State* v. *Mortensen*, 26 Utah 312, 333, 73 P. 562, 569, 633, wherein it was held competent to show the declaration of the deceased, that he was going to a certain house as he left his own house on the night of the homicide, this court quotes with approval the following from *Sugden* v. *Lord St. Leonards*, L. E. 1 P. D. 154:

"Whenever it is material to prove the state of a person's mind, or what was passing in it, and what were his intentions, there you may prove what he said, because that is the only means by which you can find out what his intentions were."

See, also, *Commonwealth* v. *Crowley*, 165 Mass. 569, 43 N. E. 509.

The next assignment goes to a similar matter of evidence. The district attorney asked the sheriff: "Q. Why did you tell him [Eaquinta] you would protect him? A. Because he had been threatened." Upon objection and motion to strike, made by the attorney for the defendant, the motion was assented to by the district attorney, and the answer stricken by the court. It is urged that the question is an improper one, and that the answer, having been made and heard by the jury, was prejudicial, notwithstanding it had been stricken. In view of the fact that the jury already had before it testimony showing in rather a detailed way the transactions and conversations had between Eaquinta and the officers, we are unable to say that the answer as given and stricken was at all prejudicial.

Lastly, it is urged that the court erred in overruling and denying defendant's motion for a new trial. The reasons assigned are those which we have discussed heretofore in this opinion. Having disposed of them as we do, there is no need to further discuss this assignment.

THE JUDGMENT IS AFFIRMED.

CHERRY, C. J., and STRAUP, ELIAS HANSEN, and EPHRAIM HANSON, JJ., concur.